UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ROSIE M. SMITH,                          )
                                         )
v.                                       )        No. 3:05-0478
                                         )
MICHAEL J. ASTRUE,                       )
        Commissioner of Social Security[1]  )


**To: Honorable Thomas A. Wiseman, Jr., Senior U.S. District Judge**


REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration denying the

plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"), as provided by the Social Security Act.

The plaintiff filed for SSI and DIB on September 6 and September 7, 2001,

respectively, alleging an onset date of September 3, 2001. She asserted disability based on

mental retardation, depression, suicide attempts, and headaches. (Tr. 429-30, 58-61, 85, 95,

425-28.) Her applications were denied initially and upon reconsideration. (Tr. 30-38, 41-42,

_____

[1]Michael J. Astrue was confirmed by the Senate as the Commissioner of Social
Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Michael J. Astrue should be substituted for former Commissioner Jo Anne B.
Barnhart as Defendant in this suit.

1

429-39.) The plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

(Tr. 43-44.) The hearing was held on October 29, 2003, in Nashville, Tennessee, before ALJ

Mack Cherry, at which time the plaintiff was represented by counsel. (Tr. 440.) The

plaintiff testified, as did one witness and a vocational expert. In a decision dated July 16,

2004, the ALJ denied the plaintiff's claim. (Tr. 15-25.) The plaintiff requested a review of

the unfavorable decision, and the Appeals Council denied this request on April 18, 2005.

(Tr. 14, 5-7.) The ALJ's decision became the final determination in this matter. Pending

before the Court is the plaintiff's motion for judgment based upon the administrative

record, the defendant's responses[2] in opposition, and the plaintiff's reply to the defendant's

response. (Docket Entry Nos. 13-16.)


## I. BACKGROUND

The plaintiff, Rosie Mae Smith, was born November 4, 1966, and was thirty-seven

(37) years old on the date of the ALJ's July 16, 2004, decision. (Tr. 58, 425, 19, 25.) The

plaintiff attended school through the eleventh grade, and she testified that all of her classes

were special education classes. (Tr. 445, 19.) The plaintiff's past work was primarily in

---

[2]The defendant inadvertently filed his response twice. Docket Entries 15 and 17 are identical, and a representative from the United States Attorney's Office advised the Court that the second filing should be disregarded.

housekeeping.[3]  (Tr. 446, 100.)  The plaintiff's testimony at her hearing demonstrated that she has some trouble remembering details of her past employment, such as the date she last worked and the duration of her employment at particular jobs, but her best recollection and available employment records indicated that she last worked in 2002.[4]  (Tr. 460-62.)

### A.  Educational Background

The administrative record in this case contains Metro Public Schools records for the plaintiff, detailing the plaintiff's performance in grades seven through part of grade twelve, as well as her scores on the Tennessee Proficiency Test ("TPT").[5]  (Tr. 142-43.)  The plaintiff's scholastic record consists mostly of below average to average grades until grade eleven, when her grades appeared to improve somewhat, and she received an "A" in science, though she still failed PE and received a grade of "C" in math.  (Tr. 142.)  The plaintiff took the TPT in grades nine through eleven, and she failed to achieve a passing score in any subject any year, never answering more than about a third of the questions in any given subject correctly, and sometimes getting as few as thirteen percent correct.

---

[3]The plaintiff also once indicated that she worked as a cook in a restaurant between 1982 and 1983.  (Tr. 86.)

[4]The plaintiff's official earnings record was not available for inclusion in the administrative record on file with this Court.  (Tr. 1.)

[5]The last grade that the plaintiff completed was the eleventh. (Tr. 445.) She attended only fifteen days of her twelfth grade year according to academic records.  (Tr. 142.)

3

Despite her improved classroom grades in grade eleven, her TPT scores went down fairly significantly that year, except for her reading score, which stayed the same as the previous year at thirty-six percent correct. *Id.*

The record contains an Individualized Education Program ("IEP") for the academic year 1983-84, the plaintiff's tenth grade year. (Tr. 145-51.) The plan indicates that the plaintiff was considered to be EMR, or Educable Mentally Retarded.[6] (Tr. 145.) The plan recommended a full-time special education program for all subject areas. *Id.*

## B. History of Medical Treatment and Application for Benefits

The administrative record contains medical records submitted by Southstreet Family Medical Center in Nashville covering the period from May 3, 2001, to June 5, 2001.[7] (Tr. 156-58.) The plaintiff presented on May 3, 2001, complaining of back pain, headaches, and weight loss, and was diagnosed with depression, headache, and joint pain. (Tr. 158.) The treatment notes indicated that the plaintiff was counseled about stress management,

---

[6]The DSM-IV now classifies "educable" retardation as Mild Mental Retardation ("MMR"). DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 43 (American Psychiatric Ass'n et al. eds. 4th ed. 2002). Persons with MMR can acquire academic skills up to approximately a sixth-grade level, and they can "usually achieve . . . self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress." *Id.*

[7]The plaintiff indicated that she had been seeing Dr. S.L. Lampkin at the Southstreet Family Medical Center since 1999 (Tr. 87, 160), but no records from the Center prior to May 3, 2001, were provided.

goal-setting, support system use, and the crisis hotline. *Id*. On June 5, 2001, the plaintiff presented seeking, *inter alia*, a "statement for court indicating that she is on medication for depression." (Tr. 157.) She was started on Paxil, having previously been prescribed an antidepressant called Remeron. *Id*.

The plaintiff filed an SSI application on September 6, 2001, followed immediately by a DIB application on September 7, 2001. (Tr. 425-28, 58-61.)

The Office of Disability Determination Section ("DDS") referred the plaintiff for a psychological evaluation on November 1, 2001. (Tr. 159-63.) Dr. William O'Brien, Psy.D., reported that the plaintiff claimed that she was mentally retarded and presented herself as a very impaired individual. The plaintiff stated that her means of support was through the contributions of friends. Dr. O'Brien noted that the results of the mental status exam should be reviewed with "extreme caution" because the plaintiff asked if she were retarded, she repeatedly answered "I don't know" in response to questions, and she gave up on tasks easily.[8] *Id.*

In collecting the plaintiff's history, Dr. O'Brien noted that during 2000, the plaintiff received two days of inpatient psychiatric treatment because she cut her arm and wrist.

---

[8]The examiner also stated that the plaintiff gave "contradictory" answers because she stated that she took her child to daycare two blocks away from her residence without assistance, though she initially reported that she needed assistance to cross the street. (Tr. 159.) The Court notes that it is possible to travel two blocks without crossing the street.

5

(Tr. 160.) Since that time, she reported receiving outpatient psychiatric services at Southstreet Family Medical Practice. The plaintiff advised that she was being treated with Celexa and Zyprexa (an antidepressant and an antipsychotic, respectively). *Id.*

The plaintiff reported dropping out of high school in the eleventh grade because she became pregnant. Prior to dropping out, she attended special education classes and reported marked problems, especially with reading and math. Her mother died in 2000, and the plaintiff described her mother as "mental." The plaintiff's maternal uncle committed suicide. Dr. O'Brien reported that the plaintiff has five children, all of whom have been in the care of her aunt since May 2001.[9] *Id.*

The plaintiff reported working at Skyline Hospital for two months in 2001, but she had to quit because of "too much stress." (Tr. 161.) At the time of examination, she was working at Meharry Hospital approximately twenty-five hours per week as a part-time custodian, and she had to be supervised to carry out her assigned work duties. The plaintiff described symptoms consistent with depression and reported hallucinations beginning in 2000. She reported seeing her dead mother and absent father two to three times per week for several minutes at a time. *Id.* The plaintiff reported the ability to

---

[9]The plaintiff testified, however, that only four of her five children are in her aunt's care. (Tr. 444.) Dr. O'Brien appeared dubious about how the plaintiff could have "managed raising these children" before May 2001, "based on her allegations of mental retardation." (Tr. 160-61.) The Court has no basis, however, to conclude that mental retardation precludes a parent from "raising" children.

6

sweep, mop, vacuum, wash dishes, do laundry and purchase food and clothing independently, as well as care for her personal needs. (Tr. 161-62.) The plaintiff reported being suspicious of others taking advantage of her, and she reported having trouble being around others. (Tr. 162.)

Dr. O'Brien concluded that the plaintiff had marked, limited intellectual functioning, and it was unclear as to whether she could handle her own funds. Her Full Scale IQ score on the WAIS-III was 61, placing her within the Extremely Low range, and her Verbal and Performance IQ scores were consistent and low, at 64 and 63, respectively. *Id*. Overall, Dr. O'Brien concluded that the plaintiff may not have provided consistent information or put forth sufficient effort, and recommended obtaining academic records to confirm the condition of mild mental retardation.[10] (Tr. 163.) Dr. O'Brien also recommended that the plaintiff be referred for an assessment "focusing on exaggeration of symptomatology." *Id*. It does not appear that the plaintiff was ever referred for such an assessment.

---

[10]The plaintiff's academic records are contained in the administrative record and discussed in Part I, section A, of this Report and Recommendation. The Court finds that her academic record does support the condition of MMR. Particularly persuasive were the plaintiff's consistently poor grades, failing TPT scores, and the IEP, which indicated a diagnosis of what is now called mild mental retardation. *See supra* n. 6.

7

On December 6, 2001, a non-examining DDS psychologist, Victor O'Bryan, Ph.D.,[11] completed a mental residual functional capacity ("RFC") assessment form and a psychiatric review technique form. (Tr. 164-67, 168-81.) The mental RFC assessment noted marked limitations only in the ability to carry out detailed instructions, with moderate limitations in several categories, including ability to complete a normal workday, interact appropriately with the general public, get along with co-workers, and ability to respond to changes in the work setting. (Tr. 164-65.) Dr. O'Bryan noted "[s]ome, but not disabling social problems," and ability to "adapt to infrequent changes in work routine." (Tr. 166.)

On the psychiatric review technique form, Dr. O'Bryan indicated that the plaintiff suffers a disturbance of mood accompanied by a full or partial manic or depressive syndrome, as well as a medically determinable impairment, listed as "Dep NOS," or "depression not otherwise specified." (Tr. 171.) Dr. O'Bryan also noted that the plaintiff has a medically determinable impairment that does not precisely satisfy the provided diagnostic criteria, but the only explanatory notation is handwritten and illegible. (Tr. 172.) Dr. O'Bryan also reported functional limitations due to affective disorder and mental retardation. (Tr. 178.) Activities of daily living were only mildly limited, with moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and

_____

[11]The plaintiff appears to believe that the ALJ misspelled Dr. O'Bryan's name, as she follows it with a "[sic]" in her brief. *See* Docket Entry No. 14, at 29. The plaintiff may simply be confusing Dr. Victor O'Bryan, a non-examining DDS psychologist (Tr. 164-67, 168-81), with Dr. William O'Brien, an examining DDS psychologist (Tr. 159-63.).

8

no episodes of decompensation of extended duration. *Id.* Finally, Dr. O'Bryan noted that the plaintiff suffered from depression not otherwise specified as well as possible psychosis not otherwise specified. (Tr. 180.) Dr. O'Bryan related that the plaintiff's IQ scores "appeared invalid," but provided no explanation other than noting a "poor effort" and "inconsistent information." *Id.* Dr. O'Bryan noted that the plaintiff provided child care, worked twenty-five hours a week as a custodian, did housework, laundry, cooked, and shopped. *Id.*

The plaintiff was notified on December 13, 2001, that she had been found not disabled by the SSA. (Tr. 34, 431.) On January 11, 2002, the plaintiff submitted a request for reconsideration. (Tr. 39-40.)

Beginning February 8, 2002, the plaintiff participated in the Family Services Counseling Program provided by Family and Children's Services through the Department of Human Services.[12] (Tr. 353.) Initially, the plaintiff and a counselor completed an assessment form, which reflected that the plaintiff verbalized frequent suicidal thoughts with an attempt at slitting her wrists the previous year, resulting in hospitalization. (Tr. 358-66.) She reported seeing her dead mother as well as hearing bells ringing and hands clapping. (Tr. 360.) She indicated that she was taking Zoloft for depression. (Tr. 361.) The plaintiff reported undergoing counseling at Tennessee Vocational

---

[12]Plaintiff's counsel explained that this counseling program assists with "addressing specific barriers that may interfere with self-sufficiency." Docket Entry No. 14, at 12.

9

Rehabilitation for one month for learning disabilities and depression. (Tr. 362.) The counselor indicated that she believed that there were barriers to the plaintiff's achieving self-sufficiency in the area of mental health issues, among others. (Tr. 365.) The plaintiff's case worker, Michele Bennett, referred her to the Mental Health Cooperative ("MHC") for mental health services. (Tr. 346.)

The plaintiff was seen at MHC on February 8, 2002, following a call placed by Ms. Bennett to mobile crisis because the plaintiff had voiced suicidal intent. (Tr. 220.) An initial assessment was completed. (Tr. 220-22.) The plaintiff reported depression for over a year and having chronic passive suicidal thoughts for that same period. (Tr. 220, 376.) She reported difficulty eating, sleeping, and maintaining employment, and said that she hallucinates and sees her mother and Jesus Christ. *Id.* The plaintiff related that in 1998, she attempted suicide by cutting her wrist, and that she has previously been on Zoloft and Prozac, which were "not very helpful." (Tr. 220-21.) The plaintiff reported that she was raped at age twelve, that she completed her education through the eleventh grade, taking special education classes throughout elementary, junior high, and high school, that her IQ scores indicate that she is "almost mentally retarded," and that she has five children, ranging in age from three to seventeen years old. (Tr. 221.) A mental status examination revealed major depressive disorder, severe, with psychotic features. (Tr. 222.) She was

10

assessed as having a Global Assessment of Functioning (GAF) of 55,[13] and started on Celexa and Zyprexa to treat her psychotic symptoms. *Id.*

The plaintiff was informed in letters dated March 11, 2002, that the denial of DIB and SSI benefits was affirmed. (Tr. 41, 438.) On April 11, 2002, the plaintiff requested a hearing with an ALJ. (Tr. 43-44.)

The plaintiff continued to be seen at MHC, reporting some improvement with medication, until April 4, 2002, when she presented claiming that she was "at [her] breaking point." (Tr. 216.) She complained of continued depression, feeling sedated on her medications, worrying about finances and work, and intermittent auditory hallucinations. *Id.* Later that month, she reported some improvement. (Tr. 215.) On June 11, 2002, the plaintiff reported continued symptoms and distress, with some self-harming behavior and inability to concentrate. (Tr. 213.)

On June 11, 2002, Ms. Bennett at Family and Children's Services requested documentation as to whether the plaintiff was able to participate in the work component of the counseling program, since the plaintiff reported that she was unable to work due to

---

[13]The GAF scale is contained in the DSM-IV, widely considered the definitive reference for mental disorders. The GAF scale is a diagnostic tool that "considers psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Ass'n et al. eds., 4th ed. 2002).

11

mental health issues.[14]  (Tr. 346.)  At MHC appointments on June 21 and July 2, 2002, the plaintiff reported doing well on medication with continued stress over her personal situation.  (Tr. 211-12.)  On July 21, 2002, Ms. Bennett noted that MHC had provided documentation supporting the plaintiff's assertions that she was unable to work.  (Tr. 342.)  Into August, the plaintiff continued to report seeing her dead mother and having crying spells and depressive symptoms, but no suicidal thoughts.  (Tr. 209.)  On August 1, 2002, the plaintiff underwent several routine medical tests at the Vine Hill Community Clinic ordered by Dr. Roger M. Des Prez, the results of which were all normal.[15]  (Tr. 228.)

On September 6, 2002, Ms. Bennett closed the plaintiff's Family Services Counseling case, noting that the plaintiff "successfully completed the Family Services Counseling Program" (Tr. 332), that she had "developed better coping skills" and was "appropriately connected to services to address her needs."  (Tr. 332-33, 337.)  Ms. Bennett also noted that the plaintiff "plans to obtain part-time employment until a decision is made re SSI claim."  (Tr. 333.)  Ms. Bennett further indicated that the plaintiff would continue to be seen on an

---

[14]The letter itself is dated June 11, 2001, but from the surrounding documentation and other context, it appears that the year indicated is a typographical error, and that the letter should have been dated 2002.

On May 16, 2002, a Vocational Rehabilitation Counselor advised Ms. Bennett that the plaintiff was not eligible for Vocational Rehabilitation Services "as a result of the psychological test results and the issue of malingering."  (Tr. 372.)

[15]The tests included thyroid functioning, STDs, liver functioning, kidney functioning, and tests for menopause.

12

outpatient basis at MHC "to address her ongoing mental health needs."[16]  (Tr. 332.)  On

September 27, 2002, however, the plaintiff reported to MHC stating that she felt as if she

were "gonna snap," and was irritable, angry, and stressed.  (Tr. 208.)

Upon referral from Ms. Bennett, the plaintiff began counseling with Centerstone

Community Mental Health Center on September 30, 2002.[17]  (Tr. 329.)  The plaintiff was

evaluated by therapist Gloria D. Anderson and reported suffering from depression,

schizophrenia, learning disability, and mental retardation.[18]  (Tr. 329.)  She reported being

sexually abused by her aunt's boyfriend at age twelve.  The plaintiff also reported suicidal

ideation without a plan as well as homicidal ideation with a plan.[19]  Id.  At this time, the

plaintiff's GAF was assessed at 50 both at the time of the evaluation and at its highest and

lowest points within the last six months.  (Tr. 394.)  The evaluator also noted that the

_____

[16]Although on September 6, 2002, Ms. Bennett included "Mental Health Issues" as
a barrier identified at the time of the plaintiff's initial assessment and in subsequent
sessions, she also noted that community services for counseling/treatment were available
to treat the plaintiff's barriers, that outpatient psychiatric treatment had been used to treat
the plaintiff's barriers, and she did not include "Mental Health Issues" as a barrier to self-
sufficiency as of September 6, 2002.  (Tr. 336, 338.)

[17]It appears that the plaintiff received medication from MHC and counseling from
Centerstone.  (Tr. 329.)

[18]The plaintiff also saw two other therapists during her treatment at Centerstone:
Melvin Ferguson for one visit on November 25, 2002, and Andrea Todd for all visits on and
after September 16, 2003.

[19]The plaintiff reported wanting to harm her aunt.  (Tr. 328.) The plaintiff stated she
would "just do it" using a gun but later denied she would actually hurt her aunt.  Id.

13

plaintiff had moderate limitations in the areas of her activities of daily living, interpersonal functioning, concentration, task performance and pace, and adaptation to change. (Tr. 392-93.)

By December 2002, the plaintiff returned to MHC reporting she was "miserable" and asking to be hospitalized. (Tr. 206.) She reported a suicidal plan involving a knife or a gun, auditory hallucinations of her dead mother, not sleeping, crying a lot, mood swings, and migraines. She described it as a "nervous breakdown," and admitted wishing she were dead. However, Dr. David Chang opined that hospitalization was "not indicated." *Id.*

On January 8, 2003, Dr. Chang reported that the plaintiff was "very depressed," "hopeless," and "[u]nable to concentrate and focus attention." (Tr. at 205.) The plaintiff continued to exhibit essentially the same pattern of depressive symptoms, occasional suicidal thoughts, financial and personal worries, and hallucinations during her sessions with Dr. Chang in February, March, April, May, June and July of 2003. (Tr. 188-204.)

Throughout her out-patient treatment at Centerstone, the plaintiff continued to complain of depression which was aggravated by stress from financial problems and a verbally abusive relationship with her live-in boyfriend, which created instability in her home life. (Tr. 245-319, 395-424.) The plaintiff also frequently complained of problems with her memory and ability to concentrate. *Id.* The plaintiff often reported having difficulty with the activities of daily living as well. (Tr. 260, 264, 270, 291, 293, 297.)

14

However, she experienced periods during her treatment when she reported no trouble maintaining these activities. (Tr. 289, 311, 319.) The plaintiff reported occasional instances of visual and auditory hallucinations, which included her deceased mother telling her to "get up, I know you can do it" and "you don't have to go through that." (Tr. 245, 280, 285, 287, 292.) On one occasion, Ms. Anderson noted that the plaintiff was also suffering from "persecutory delusions" including the delusion that her daughter's teachers were talking about her. (Tr. 292.) She expressed suicidal ideation on several instances throughout the treatment process. (Tr. 252-54, 286-87, 290, 395, 398, 409, 417-23.)

Despite these issues, the plaintiff reported to Centerstone on January 10, 2003, feeling only a "little bit" depressed and "much better." (Tr. 292.) Ms. Anderson noted several times during the treatment that her affect was brighter and mood was improved. (Tr. 271, 292, 314.) On January 29, 2003, the plaintiff's GAF was again evaluated by Centerstone and found to be 50 at the time of evaluation as well as at its highest and lowest points during the six months prior to evaluation. (Tr. 391.) During this evaluation, the evaluator again noted that plaintiff had moderate limitations in the areas of her activities of daily living, interpersonal functioning, concentration, task performance and pace, and adaptation to change. (Tr. 389-90.) During the plaintiff's treatment at Centerstone, her subsequent GAF evaluations remained identical.[20] (Tr. 266-68, 386-88, 383-85.)

---

[20]The plaintiff's GAF was assessed at Centerstone on July 17, 2003, October 20, 2003, and February 16, 2004.

On February 5, 2003, Dr. Chang at MHC provided a Medical Source Statement of Ability to Do Work-Related Activities. (Tr. 183-87.) Dr. Chang indicated that he started treating the plaintiff on December 11, 2002, and diagnosed Major Depressive Disorder, severe, with a GAF of 55, and a highest GAF in the past year of 60. (Tr. 183.) He indicated that she exhibited the following symptoms: poor memory, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, decreased energy, and hostility or irritability. Dr. Chang stated that the plaintiff was "unable to function at home," had a "dysphoric affect, tearfulness, irritability, and a growing sense of hopelessness." *Id.* He indicated treatment with medication and psychotherapy, although he reported a "very limited response," with a "marginal" prognosis. (Tr. 184.) He also indicated that the plaintiff's impairment had lasted or could be expected to last twelve months, and stated that her back and other pain symptoms were exacerbated by the depressive symptoms. Dr. Chang checked "no" when asked if the plaintiff had a low I.Q. or reduced intellectual functioning, but provided no explanation or documentation for his response. Dr. Chang then opined that the plaintiff's

16

impairments would cause her to be absent from work more than three times per month.[21]

*Id.*

In the space provided to evaluate the plaintiff's ability to do unskilled work, Dr. Chang universally rated the plaintiff's ability as only "fair" (seriously limited) or "poor or none" (no useful ability to function) in all categories save one, where he marked that she had a "good" ability to sustain an ordinary routine without special supervision. (Tr. 185.) Under semiskilled and skilled work, Dr. Chang marked "poor or none" for all categories, noting that the plaintiff had "very poor skills in the ability to adapt to stressful situations." (Tr. 186.) As a result of the plaintiff's mental impairments, Dr. Chang opined that her activities of daily living were moderately limited, and that she was markedly limited in maintaining social functioning and maintaining concentration, persistence or pace. *Id.* Dr. Chang indicated that her symptoms appeared to have had significant impact beginning in February 2002. (Tr. 187.)

On April 7, 2003, the plaintiff reported to Centerstone that she was "doing alright" and had no current stressors. (Tr. 279.) On May 27, 2003, the plaintiff returned to Vine Hill Community Clinic. The staff noted that plaintiff suffered from several "Known Significant Medical Diagnoses and Conditions" including learning disability, mental retardation,

---

[21]The Medical Source form includes options from "Never" being absent from work to "More than three times" a month. (Tr. 184.) The option that Dr. Chang selected indicated the most possible absenteeism.

headaches, chest pain, and congenital heart murmur and was currently taking Depakote, Zyprexa, and Celexa.  (Tr. 227.)

Continuing throughout the summer and into the fall of 2003, the plaintiff returned to MHC several times for treatment from Dr. Chang.  On July 9, 2003, Dr. Chang saw the plaintiff and noted "Med compliant with no [side effects]."[22]  (Tr. 188.)  On August 6, 2003, the plaintiff reported to MHC feeling "fed up" and needing a rest for two weeks, having trouble sleeping, and feeling stressed over financial issues and school starting.[23]  (Tr. 238.) She reported suicidal ideation, hallucinations including her mother's voice and seeing things move, and paranoia.  Dr. Chang found that her memory was adequate, but judgment and insight were impaired.  He gradually changed her from Celexa to Zoloft and continued her treatment on Zyprexa and Remeron.  *Id.*  On September 3, 2003, the plaintiff returned complaining of trouble sleeping, auditory hallucinations, a loss of appetite, and "blackouts," which included dizziness and blurred vision.  (Tr. 236.)  The plaintiff reported stressors including her finances, living situation, and child support issues.  Dr. Chang

---

[22]The original typewritten notation reads "Med compliant with no se."  The defendant offers the interpretation that "se" stands for "symptoms."  *See* Docket Entry No. 15 at 5.  However, as the plaintiff correctly points out, the more common medical abbreviation for "symptoms" is "sx," while "se" refers to "side effects."  *See* Docket Entry No. 16 at 1.  The Court is convinced that this latter interpretation is correct, based on both common medical usage and the context of the usage in this instance. Dr. Chang was noting that the plaintiff was taking her medications as directed and not experiencing any side effects.

[23]The plaintiff must have been referring to her five-year-old daughter starting school.

18

increased her Remeron and Zoloft and refilled her other prescriptions. *Id.* On September 8, 2003, the plaintiff returned without an appointment because she was having difficulty coping with the sudden death of her boyfriend on September 4. (Tr. 234.) She complained of visual hallucinations of both her deceased mother and deceased boyfriend as well as headaches. *Id.* At her October 15 appointment, the plaintiff complained of blurry vision, homicidal ideation with no plan, short-term memory problems, and mood swings, but reported that the medication improved her mood swings. (Tr. 232.)

On September 16, 2003, plaintiff reported to Centerstone still distraught over the sudden death of her boyfriend; however, when she returned on October 1, 2003, the plaintiff reported "doing better this week."[24] (Tr. 254, 253.) During her October 27 appointment, the plaintiff reported that therapy was helping with her suicidal thoughts. (Tr. 423.)

On October 29, 2003, an administrative hearing took place before ALJ Mack Cherry. (Tr. 440-77.) At that hearing, the plaintiff testified that she was thirty-six years old with five children, only one of whom is in her custody.[25] (Tr. 444.) She testified that she completed the eleventh grade with a special education curriculum and had problems with reading

---

[24]The Centerstone records, as well as the plaintiff's friend Susan Hannah, stated that the plaintiff's boyfriend died from a sudden aneurysm. (Tr. 254, 472.)

[25]The plaintiff testified that her five-year-old daughter Brittany lives with her, while her four older children are in the custody of her aunt. (Tr. 445.)

19

and math, retaining the ability to read "just a little bit." (Tr. 445.) The plaintiff also stated that her medication made her sleep some during the day but very little at night. (Tr. 449.) She testified that she sees and hears her deceased mother and deceased boyfriend. (Tr. 450.)

The plaintiff testified that she does what housekeeping she can, but is no longer able to cook or shop for herself because of her memory problems. (Tr. 450-52.) She stated that she walks to church but has only one friend because she does not like to be around a lot of people and is afraid of people taking advantage of her. (Tr. 451-52.) The plaintiff reported that she has done mostly part-time hotel work in the past for periods of two or three months at a time. (Tr. 446-47.) She testified that she is unable to work because of her nerves, mood swings, and learning disability, but her medication helps with the mood swings. (Tr. 448-49.) The plaintiff testified that in 2001 she worked as many as five days a week for four to five hours a day in hotel work through a temporary service.[26] (Tr. 453, 460.) The plaintiff testified that she has never been hospitalized for mental health reasons, although "they" wanted to hospitalize her but were unable because she would have no one to care for her daughter. (Tr. at 455.) She testified that a friend pays her bills. (Tr. 458.)

_____

[26]Originally, the plaintiff stated that she was currently working five days a week for four to five hours a day, but later in her testimony she stated that she had been confused about the dates. (Tr. 453, 460.) The ALJ had apparently confused the files and asked questions based on another individual's employment record. (Tr. 460.) After this misunderstanding was remedied, the plaintiff stated that she was currently not working and had not worked since 2001 or possibly 2002. (Tr. at 460-61.)

20

Susan Hannah, a friend of the plaintiff's with a master's degree in psychology and biology as well as some experience in mental health work, also testified at the hearing. (Tr. 462-74.) Ms. Hannah testified that she met the plaintiff when the plaintiff's daughter, Brittany, began attending the family enrichment center where Ms. Hannah is the director. (Tr. 463.) Ms. Hannah testified that the plaintiff began coming to her with her problems, which led to Ms. Hannah becoming a "caretaker." (Tr. 464.) Ms. Hannah testified that she made sure the plaintiff's rent and bills were paid, Brittany had clothes, and that the plaintiff had food to eat, including paying for these needs with her personal funds. *Id.* She also testified that she meets Brittany at the school bus stop every day and helps her with her homework because the plaintiff is unable to do so. (Tr. 469.) Ms. Hannah stated that she did not believe the plaintiff was able to pay her bills. (Tr. 465.) She explained that in the past she had discovered that the plaintiff's electricity had been cut off due to unpaid bills, which the plaintiff did not seem to understand. *Id.* Ms. Hannah testified that the plaintiff worked two or three days a week in 2002 and had tried to do some sporadic housework for neighbors in 2003 but occasionally she would have to cancel because of illness. (Tr. 466-67, 469.) She also testified that she had witnessed the plaintiff suffering from mood swings, talking to herself, having crying spells, and talking about suicide, especially since the death of her boyfriend. (Tr. 468, 470.)

Jane Brenton, a Vocational Expert ("VE"), testified at the same hearing that housekeeping work was classified as medium and unskilled labor. (Tr. 474.) The ALJ asked the VE to assume that the plaintiff had a third grade reading level, no ability to climb ladders, ropes, or scaffolding, should avoid hazardous machinery and unprotected heights, has a marked limitation on understanding, remembering, and carrying out detailed instructions, a moderate limitation on working with co-workers, a moderate limitation on adapting to changes and completing a normal workday, a moderate limitation on concentration for an extended period of time, and a moderate difficulty in dealing with the general public. (Tr. 474-75.) The VE testified that a person with these limitations and a GAF in the range of 51 would be able to perform the plaintiff's previous work. (Tr. 475-76.) The VE also testified that a person with the abilities described in Dr. Chang's statement (marked difficulty in social functioning, concentration, persistence, and pace and a failure to complete tasks in a timely manner) or with a GAF of 50 would not be able to perform the plaintiff's past relevant work. (Tr. 476-77.)

Based on the record, the ALJ made the following findings in his July 16, 2004, decision. (Tr. 24-25.)

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant's depression and estimated borderline intellectual functioning are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity as described in the body of the decision.

7.      The claimant's past relevant work as a housekeeper did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).


## II.  DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion.  42 U.S.C.A. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial

evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by

medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Case 3:05-cv-00478  Document 18  Filed 03/27/08  Page 25 of 38 PageID #: 123

In addition, the plaintiff must show that she became disabled prior to the expiration of her insured status. 42 U.S.C.A. § 423(a) and (c). "When one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter." *Henley v. Comm'r of Soc. Sec.,* 58 F.3d 210, 213 (6th Cir. 1995) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)).

Third, if the plaintiff is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered

relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[27] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health &*

---

[27]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

27

*Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further.  20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).  In this case, the ALJ resolved the plaintiff's case at step four of the inquiry.  The ALJ found, *inter alia*, that the plaintiff has the residual functional capacity to perform her past relevant work as a housekeeper.  (Tr. 24.)

The plaintiff asserts three grounds for reversal.  First, the plaintiff alleges that the ALJ erred in evaluating the medical evidence provided by the plaintiff's treating physician Dr. Chang.  Second, the plaintiff asserts that the ALJ  failed to properly evaluate the opinions of the nonexamining physicians.  Third, the plaintiff argues that the ALJ was not entitled to deny disability benefits based on substantial evidence on the record as a whole.  The plaintiff seeks a reversal of the Commissioner's decision and an award of benefits or remand.

28

**A. The ALJ did not err in rejecting the opinion of Dr. Chang, the plaintiff's treating physician.**

The plaintiff argues that the ALJ did not comply with the relevant procedural requirements in evaluating the medical opinion of Dr. Chang, one of the plaintiff's treating physicians. Docket Entry No. 14, at 17. The plaintiff contends that the ALJ's failure to follow the specific procedures for accepting or rejecting the opinion of a treating physician constitutes reversible error. *Id.* The ALJ declined to give controlling weight to Dr. Chang's opinion because he found that Dr. Chang assigned a degree of limitation that was internally inconsistent with his own treating records, observations, and diagnoses, and because Dr. Chang's opinion was inconsistent with other substantial evidence, specifically, reports of ongoing back pain and other pain symptoms. (Tr. 22.)

The Social Security Administration follows the "treating source" rule. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998). Social Security Regulations provide that while the ALJ is entitled to give the treating physician's medical opinion more or controlling weight in a disability claim, this is only appropriate where the opinion is "well-supported" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).

The ALJ satisfied the agency's procedural requirements by giving good reasons for the weight he decided to grant Dr. Chang's opinion. The plaintiff argues that after the ALJ decided not to grant controlling weight to the treating physician's opinion, he failed to

29

evaluate the opinion based on several factors and give specific reasons that the greatest weight was not applied, as required in the Social Security Regulations. Docket Entry No. 14, at 22. Social Security Regulations provide that if a treating physician's opinion is not given controlling weight, the ALJ is to apply several factors set forth in the regulations when determining the proper weight to give the opinion.[28] 20 C.F.R. § 404.1527(d)(2). The Sixth Circuit Court of Appeals has held that the decision to assign little weight because of inconsistencies with the record is "a factual determination within [the ALJ's] discretion under 404.1527(d)(2)." *Smith v. Commissioner of Social Security*, 482 F.3d 873, 877 (6th Cir. 2007). The regulations, as well as settled case law, merely require the agency to "give good reasons" or "some basis" for disregarding the medical opinion of a treating physician. *Id.* at 875; *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

While the plaintiff interprets the regulations to mean that the ALJ must specifically explain the application of each factor in the regulation and its bearing on his decision, well-established case law does not support this interpretation.[29] In *Shelman*, the Sixth Circuit held that an ALJ erred by rejecting the treating sources' opinions without finding that they

---

[28]These factors include length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factors brought to the agency's attention. 20 C.F.R. § 404.1527(d).

[29]In support, the plaintiff cites *Smith*, 482 F.3d at 546. *See* Docket Entry No. 14, at 20-21. However, the Court in *Smith* did not address whether an ALJ was required to address each such factor.

30

were not supported by sufficient data, although the Court also found that the ALJ was merely "required to set forth *some basis* for rejecting these opinions." 821 F.2d at 321 (emphasis added). In *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993), the Sixth Circuit further clarified this requirement, finding that a treating physician's opinion may be rejected "if good reasons are identified for not accepting it." In *Bogle,* the Court found that an ALJ was not bound by the treating physician's finding of disability because the physician's opinion contained conflicting statements, and that these conflicting statements amounted to good reasons for rejecting the treating physician's opinion. *Id.*

Here, the ALJ stated good reasons for the weight he assigned the opinions of the treating physician, including inconsistences within Dr. Chang's records regarding the plaintiff's GAF and her complaints of pain. (Tr. 22.) The most significant issue is the internal inconsistency in Dr. Chang's medical source statement. Dr. Chang estimated that the plaintiff's GAF was 55, with a highest GAF in the past year of 60. The DSM-IV provides that a GAF of between 51 and 60 generally reflects moderate symptoms and difficulty. However, Dr. Chang described the majority of the plaintiff's symptoms (difficulty maintaining social functioning, concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner) as marked, which is generally demonstrated by a

31

significantly lower GAF.[30] Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Ass'n et al. eds., 4th ed. 2002). The ALJ correctly stated that the plaintiff's "[GAF] scores are not consistent with the physician's stated degree of limitations." (Tr. 22.)

The ALJ also took issue with Dr. Chang's mention of the plaintiff's "on-going back and other pain symptoms which also exacerbate her depressive symptoms while also worsened by the depression." *Id.* The ALJ found these symptoms unsupported by the plaintiff's statements both to the ALJ and in the plaintiff's medical records as a whole. The ALJ pointed out that the plaintiff had not alleged "any back problems or pain," and that there was a lack of "any prescribed pain medication," citing to a Vine Hill Community Clinic record dated November 13, 2003, in which the plaintiff complained only "of various aches and pains that are abated with Tylenol."[31] *Id.* There is one instance in the record documenting a complaint of back pain and joint pain, on May 3, 2001, recorded by a nurse

_____

[30]The DSM-IV specifically describes a GAF in the 51 to 60 range as indicating "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." A GAF in the 41 to 50 range is identified by "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Ass'n et al. eds., 4th ed. 2002).

[31]The plaintiff reported that she had "migraine related" headaches but did not take medication for them, and that her pain was "off and on" and "abated with [T]ylenol." (Tr. 379.)

at Southstreet. (Tr. 158.) The plaintiff also complained of chest pain on May 27, 2003 (Tr. 227), but overall, the record is devoid of any significant or regular indications that the plaintiff was experiencing or being treated for pain symptoms.

The ALJ was within the limits imposed by the treating source rule when he declined to give controlling weight to Dr. Chang's opinion because of inconsistencies between his conclusions and the record as a whole. Those inconsistencies qualify as good reasons for assigning less weight to Dr. Chang's opinion. Therefore, the ALJ complied with the procedural requirements prescribed by controlling regulations and case law in evaluating the treating source's diagnosis.

### B. The ALJ followed procedural requirements in evaluating the opinion of the non-examining state agency psychological consultant.

The plaintiff claims that both statutory regulations and case law prohibit the ALJ from rejecting the findings of a treating source, while accepting the findings of a non-examining source. Docket Entry No. 14, at 29-30. Specifically, the plaintiff takes issue with the ALJ's failure to credit the opinions of Dr. Chang, a treating physician, and she objects to the credence given to the opinions of other, non-treating sources.

Social Security Regulations provide that all medical opinions will be evaluated using several factors. 20 C.F.R. § 404.1527(d). According to the regulations, the agency will "consider all of the following factors in deciding what weight [it gives] to any medical

33

opinion." *Id*. These factors include the examining relationship, the treatment relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability, the consistency, and the specialization of a medical opinion. *Id*. The plaintiff argues that the ALJ could not have considered these factors while accepting the opinion of the non-examining physician and rejecting the opinion of the treating physician. Docket Entry No. 14, at 29.

However, as further explained in a Social Security Ruling, "in appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight that the opinions of treating or examining sources." SSR 96-6P. There is no strict "hierarchy," as the plaintiff asserts, that requires that a treating physician's opinion automatically be given greater weight than the opinion of a non-treating or non-examining source. Docket Entry No. 14, at 28. Therefore, an ALJ could evaluate the opinions based on the required factors and still conclude under appropriate circumstances that the non-examining source was entitled to greater weight than the treating source.

The plaintiff also argues that relevant precedent requires the ALJ to give less weight to the opinion of a non-examining physician when it is contrary to the opinion of a treating physician. Docket Entry No. 14, at 31, citing *Shelman*, 821 F.2d at 321. While the Court in *Shelman* did reverse an ALJ's decision to discredit the treating source in favor of a non-

34

examining source, it also found that an ALJ is "not bound by the opinions of plaintiff's treating physicians." 821 F.d at 321. The Court further held that even though the opinions of non-examining sources alone are an insufficient basis for discrediting the opinions of treating sources, an ALJ is free to reject the opinion of a treating source based on different grounds and adopt the opinion of a non-examining source. *Id*.

The facts in this case are distinguishable from those in *Shelman* in that the ALJ in *Shelman* improperly rejected the opinions of two treating sources based solely on the opinion of one non-examining source. *Id*. However, the ALJ in this case properly rejected the opinion of the plaintiff's treating physician because of inconsistencies as outlined above and not based solely on the opinions of a non-examining physician, as prohibited by *Shelman*. Therefore, the case law offered by the plaintiff does not require the ALJ to reject the non-examining source's findings in favor of the treating source's opinion.

Under the circumstances of this case, the ALJ's decision to accept the opinion of the non-examining state psychological consultant was not contrary to procedural requirements. Furthermore, the ALJ's decision to reject the treating physician's opinion was supported by good reasons and not dependent on the contrary opinions of non-examining sources. Therefore, the ALJ's evaluation and acceptance of the non-examining state agency psychological consultant was proper.

35

**C. The ALJ's decision was supported by evidence on the record as a whole.**

The plaintiff alleges that the ALJ's decision was not supported by substantial evidence on the record as a whole. Docket Entry No. 14, at 31. As discussed above, an ALJ's findings must be supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Her,* 203 F.3d at 389. Furthermore, the ALJ's decision must be upheld even if the evidence may support another conclusion, as long as the evidence "could reasonably support the conclusion reached." *Id.* at 390. The ALJ relied on several different opinions and pieces of evidence in making his decision to deny the plaintiff's disability claim. The ALJ cited Dr. William O'Brien's examination, in which Dr. O'Brien noted that the plaintiff did not put forth maximum effort and was not fully cooperative during her psychological exam, easily giving up on tasks or responding with "I don't know."[32] (Tr. at 20.) In

---

[32]The ALJ also indicated that Dr. O'Brien found that the plaintiff had a ninth grade spelling capability and a third grade math ability. (Tr. 20.) The ALJ cited to Dr. O'Brien's November 1, 2001, examination and the results of several verbal and performance tests that he administered to the plaintiff during that examination in support of this statement. (Tr. 159-63.) While there is no specific reference to any grade level correlation of spelling or math skills, Dr. O'Brien's report does set out the results of the "Verbal Subtest" with the corresponding "Age-Corrected Scaled Scores." (Tr. 162.) The plaintiff received a "3" in arithmetic, perhaps interpreted by the ALJ to correlate to a third grade math level. *Id.* However, the plaintiff also received a "3" in vocabulary, which would have also equated to a third grade spelling level. *Id.* Based on multiple spelling errors on the forms that the plaintiff completed contained in the record, it is doubtful that the plaintiff achieved even a ninth grade spelling level. *See, e.g.,* Tr. 100.

addition, the ALJ referred to Dr. Victor O'Bryan's review of the plaintiff's medical records, in which he concluded that the plaintiff had no more than moderate limitations in most areas and marked limitation only on her ability to carry out detailed instructions. (Tr. at 20-21.) The ALJ also noted that several times in the plaintiff's records from the Mental Health Cooperative, she reported that she was sleeping well, her medications were effective, and her appetite was good. (Tr. at 21.)

In the ALJ's decision, he specifically analyzed the records from Centerstone Mental Health Center and those provided by Dr. Chang, and the ALJ gave reasons for his decision not to award these opinions significant weight. (Tr. at 23.) The ALJ also found the plaintiff's testimony about her daily activities to be only partially credible because it conflicted with her earlier statements to Dr. O'Brien.[33] (Tr. at 23.) Even if the Court found that the evidence provided by Dr. Chang, the MHC, and the plaintiff could be enough to support a favorable verdict for the plaintiff, it would still be bound to uphold the decision of the ALJ, since there was substantial evidence to support his findings.

---

[33]The plaintiff testified at the administrative hearing that she was unable to shop, cook, and clean (Tr. 450-52), which conflicted with her earlier statements to Dr. O'Brien that she shops and cleans (Tr. 161). The Court notes that Dr. O'Brien saw the plaintiff in November 2001, and that the plaintiff's hearing was held in October 2003, nearly two years later, and that it is possible that her activities of daily living may have become more limited over that time period. Ultimately, however, the plaintiff made no objection to the ALJ's assessment of her credibility or to his failure to fully credit her subjective complaints, and the Court does not address these issues further.

37

## III.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


JULIET GRIFFIN
United States Magistrate Judge

38